CITY ENVIRONMENTAL,
INC., Plaintiff,

v.

U.S. CHEMICAL COMPANY,
et al., Defendants.

No. 91–74810.

United States District Court,
E.D. Michigan, S.D.

Feb. 5, 1993.

Robb, Muskegon, MI, David L. Tripp, Kathryn J. Humphrey, Paul F. Bohn, Dykema Gosett, Detroit, MI, Charles L. McKelvie, Dold, Spath & McKelvie, P.C., Troy, MI, Karen Khalil, Chrysler Corp., Highland Park, MI, Ronald W. Zdrojeski, Hebb & Gitlin, A Professional Corp., Hartford, CT, Darlene M. Domanik, Jack D. Shumate, Butzel Long, Stuart H. Teger, Honigman, Miller, Schwartz & Cohn, Robert A. Marsac, James F. Kamp, Wise & Marsac, Detroit, MI, Bruce J. Lazar, Couzens, Lansky, Fealk, Ellis, Roeder & Lazar, P.C., Farmington Hills, MI, Mark D. Edie, Ford Motor Co., Dearborn, MI, Kathleen M. Whittey, Husch & Eppenberger, St. Louis, MO, Mary P. Sclawy, Grand Trunk Western Railroad, Michelle T. Fisher, General Motors Corp., Detroit, MI, Louis R. Pepe, Pepe & Hazard, Hartford, CT, for defendants.

## OPINION AND ORDER REGARDING FOUR MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This CERCLA action is presently before the Court on four motions for summary judgment filed by the following parties:

(1) Plaintiff City Environmental, Inc.;

(2) Defendants General Motors Corporation, Sea Ray Boats, Inc., Chrysler Corporation, BASF—Inmont Corp., Reichhold Chemicals, Inc., Acme Quality Paints Co., Foamseal, Inc., Hoover Universal, Inc., and Allied-Signal (the "Metamora Settling Defendants");

(3) Defendants Navistar International Transportation Corporation, Eaton Corporation, Wacker Silicones Corporation, and Dana Corporation (the "Navistar Defendants"); and

(4) Defendants Dow Corning Corporation, The Upjohn Company, and Grimes Aerospace Company, as successor to Midland-Ross Corporation (the "Peripheral Defendants").[1]

Thomas M. Fallucca, Mark S. Demorest, The Robert P. Ufer Partnership, Bloomfield Hills, MI, for plaintiff.

Thomas P. Wilczak, Pepper, Hamilton & Scheetz, Detroit, MI, Michael H. Whiting, Stark, Reagan & Finnerty, P.C., Troy, MI, Steven C. Kohl, Landman, Latimer, Clink &

1. These four motions are essentially "cross-mo- tions for summary judgment", Plaintiff, on the

The principal issue presented by the subject motions is whether Plaintiff City Environmental, Inc., the purchaser of the assets of Defendant U.S. Chemical Company, should be held fully liable as a successor corporation for U.S. Chemical's environmental obligations arising as a result of U.S. Chemical's pre-Asset Sale disposal of hazardous wastes at several landfills, including the Metamora Landfill, in Metamora, Michigan.

Having reviewed and considered the parties' respective briefs and exhibits in support thereof, and having heard the oral arguments of the parties' counsel at the hearing held on January 21, 1993, the Court is now prepared to rule on the pending motions. This Opinion and Order sets forth that ruling.

## II. PLAINTIFF'S COMPLAINT

In its four-count Amended Complaint in this action, City Environmental seeks a declaratory judgment (in Count I) that it is not the successor corporation to U.S. Chemical and does not have successor liability for any of U.S. Chemical's CERCLA or other offsite environmental obligations. In Count II, City Environmental requests that, if the Court finds that Plaintiff is the successor corporation to U.S. Chemical, it enter a declaratory judgment that City Environmental's liability is limited to the value of the assets actually received. The instant motions for summary judgment concern only these two counts of Plaintiff's Amended Complaint,[2] and the Me-

tamora Settling Defendants' Counterclaim by which, these Defendants conversely seek a declaratory judgment that City Environmental *is* fully and completely liable as a successor corporation for U.S. Chemical's potential Metamora Landfill CERCLA liability.

## III. PERTINENT FACTUAL BACKGROUND

### A. DEFENDANT U.S. CHEMICAL'S BUSINESS PRIOR TO OCTOBER 12, 1990

Defendant U.S. Chemical Company was incorporated as a Michigan corporation in 1962. The company is wholly-owned by the two individual Defendants, William P. Greenway and Leonard F. Coraci, each individual owning a 50% interest in the corporation.[3]

Since at least 1965, U.S. Chemical engaged in the business of "solvent reclamation", which involved the treatment, recycling, storage and disposal of waste contaminated solvents of its customers.[4] These solvent reclamation/recycling operations were conducted at U.S. Chemical's facility on Calahan Street, in Roseville, Michigan (the "Calahan Property"). With respect to its storage and disposal activities, U.S. Chemical stored and disposed of some of the contaminated waste on the Calahan Property, itself, pursuant to its site-specific permit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* (the "RCRA"),[5] and some of it

one hand, and the three groups of Defendants on the other hand, respectively seeking entry of a declaratory judgment in their favor on the legal issue of the alleged "successor liability" of Plaintiff for the CERCLA liabilities of Defendant U.S. Chemical.

**2.** Count III of Plaintiff's Amended Complaint, captioned "Recission", is pled in the alternative to Counts I and II, and is directed only to Defendants U.S. Chemical, and William P. Greenway and Leonard F. Coraci, who each own/owned 50% of U.S. Chemical. In that count, Plaintiff requests that, if City Environmental is held to be U.S. Chemical's successor and responsible for its CERCLA liabilities, the Court enter an order rescinding the City Environmental/U.S. Chemical Asset Purchase Agreement.

Count IV, captioned "Setoff", is also directed only to Defendants U.S. Chemical, William Greenway and Leonard Coraci. This count is predicated upon express provisions in the Asset

Purchase Agreement providing that City Environmental is entitled to set off against its purchase price obligations all costs and attorneys' fees incurred as a result of U.S. Chemical's, Greenway's and Coraci's breaches of warranties, representations and agreements.

**3.** Not only are Greenway and Coraci the sole shareholders of U.S. Chemical, but also, they are the sole officers and directors of the corporation.

**4.** Some of the Defendants in this action—in particular, General Motors, Ford Motor Company and Chrysler—are former customers of U.S. Chemical which provided U.S. Chemical with used solvents for recycling.

**5.** Being "site-specific", U.S. Chemical's RCRA permit only authorized hazardous waste storage at the Calahan Property. U.S. Chemical was issued its RCRA permit on October 26, 1984 and it was effective for ten years, i.e., through 1994.

was transported from the Calahan facility to various off-site landfills. One of these landfills was the Metamora Landfill in Lapeer County.

## B. PLAINTIFF CITY ENVIRONMENTAL'S BUSINESS PRIOR TO OCTOBER 12, 1990

Plaintiff City Environmental, Inc. was incorporated as a Michigan corporation in 1982.[6] Since 1985, City Environmental has been an environmental services company in the business of treating and processing the industrial waste of its customers. Prior to October 12, 1990, the company owned and operated two facilities in Detroit where it performed its waste treatment services. At one facility located on Frederick Street, City Environmental operated a liquid waste treatment plant. The other facility, located on Harper Street, accepted sludges which were solidified and stabilized with lime and kiln dust, and then transported to a landfill.[7] City Environmental did not perform solvent recycling/reclamation services as did U.S. Chemical, and it did not have an RCRA permit for waste storage at either of its two facilities.

## C. THE U.S. CHEMICAL/CITY ENVIRONMENTAL ASSET PURCHASE NEGOTIATIONS AND AGREEMENT

In 1984, Messrs. Greenway and Coraci decided to sell U.S. Chemical. From 1984 through 1990, they negotiated or discussed without success a sale of the business with a number of waste management companies.

The decision to sell U.S. Chemical was based upon several factors. These included: (1) Coraci's decision to retire; (2) a declining solvent recycling market; (3) the fact that, due to high-tech advances, U.S. Chemical's equipment was becoming outdated; (4) the owners' belief that an extensive and costly corrective environmental cleanup of the Calahan Property was going to be required in order for U.S. Chemical to renew its RCRA Permit when it expired in 1994.

U.S. Chemical first contacted City Environmental in mid–1989 to inquire whether City Environmental was interested in acquiring U.S. Chemical. In late July of that year, City Environmental advised U.S. Chemical that it was interested in discussing acquisition. Negotiations between the parties continued over the course of the next year and a half. After exchanging several proposed agreements, City Environmental and U.S. Chemical finally executed the Asset Purchase and Sale Agreement at issue in this case on October 12, 1990.

The Asset Purchase and Sale Agreement provided for City Environmental's purchase of "all right, title and interest to all of the tangible and intangible assets which comprise [U.S. Chemical's] Business operations; excluding only cash on hand and in banks, trade and employee receivables, the Company name, officer life insurance policies, and the real estate located in St. Clair County or the proceeds therefrom". [Asset Purchase and Sale Agreement, para. 1.A.] The consideration given by City Environmental to U.S. Chemical for the assets purchased was $720,-000.00, payable in installments, plus City Environmental's assumption of hazardous waste contamination cleanup liability on the Calahan Property.[8]

---

6. On June 30, 1992, City Environmental merged with *City Management Corporation*, and now is a division of that company.

7. It appears to be undisputed that City Environmental did not, at any time, dispose of any of its customers' waste materials at the Metamora Landfill or any of the other *sites identified by the parties in this action.*

8. During the course of the nearly year and a half negotiations between the parties, City Environmental retained the services of Techna Corporation to perform an environmental site investigation of the Calahan Property. Techna's investigation, which was conducted over a one month period in March–April, 1990 included a soil and groundwater analysis. Techna's soil boring and groundwater monitoring revealed a significant risk that the Calahan Property was environmentally contaminated with significant levels of volatile organic solvents, chromium, lead, silver, zinc and cadmium.

Then, in September of 1990, ECT, another environmental consulting firm, was retained to review the Techna report. ECT agreed with Techna's conclusion that serious contamination existed on the Calahan Property. It appears, however, that neither Techna nor ECT made any dollar estimate of the cleanup costs prior to the October 12, 1990 execution of the Asset Purchase

The Agreement expressly provided, however, that City Environmental's assumption of hazardous waste contamination liabilities in connection with the Calahan Property were the only CERCLA/environmental cleanup liabilities being assumed.

Section 3 of the Asset Purchase and Sale Agreement provided as follows:

3. *Liabilities*

A. *Assumed Liabilities. The only liabilities assumed by Buyer are as follows:*

i. Any contamination cleanup liability relating to or resulting from the Real Property [i.e., the Calahan Property] acquired by the Buyer. . . .

B. *Liabilities Not Assumed.* Buyer shall *not* assume any liability other than those liabilities specifically described above in this Paragraph 3. Without limiting the generality of the foregoing statement and limitation, Buyer shall not assume, and Company shall retain and be responsible for, the following liabilities and obligations of [U.S. Chemical]: . . . (13) any CERCLA or other environmental liabilities of any nature with respect to the cleanup of any real property, sites or other facilities to which [U.S. Chemical] transported hazardous or other waste at any time prior to the Closing, or with which [U.S. Chemical] was otherwise involved at any time for any reason, except only for the Real Property as provided above.

[Asset Purchase and Sale Agreement, Section 3, Ex. 16] [9]

On the same date that City Environmental and U.S. Chemical executed the Asset Purchase and Sale Agreement, i.e., October 12, 1990, City Environmental submitted to the U.S.E.P.A. a revised RCRA permit application, notifying the EPA of the change of ownership and operational control of the Calahan facility to obtain a transfer to City Environmental of U.S. Chemical's RCRA permit for that facility. The EPA approved the transfer on November 7, 1990. [10]

## D. U.S. CHEMICAL'S INVOLVEMENT WITH THE METAMORA LANDFILL SUPERFUND SITE

Meanwhile, as the 1989–1990 asset purchase negotiations were going on between City Environmental and U.S. Chemical, U.S. Chemical was notified by the U.S.E.P.A. by certified letter in November 1989 that U.S. Chemical was a potentially responsible party ("PRP") with respect to CERCLA liabilities arising as a result of the dumping of hazardous waste at the Metamora Landfill. [11] The EPA letter advised U.S. Chemical that the government had, as of that date, already incurred approximately $44 million in response costs at the site and expected to

---

Agreement, although as of that date, City Environmental estimated that cleanup would run in the $1 million to $5 million range.

Following the closing of the asset purchase, City Environmental again retained Techna to further analyze the extent of contamination at the Calahan Property. Techna concluded that the remediation cleanup costs would range at a minimum of $1.4 million to more than $3 million. Techna's investigation is ongoing and continues today.

9. In addition to the execution of the Asset Purchase Agreement, on October 12, 1990 U.S. Chemical's owners, Defendants Greenway and Coraci also individually executed covenants not to compete prohibiting them from competing with City Environmental and from using the name "U.S. Chemical Company" for a period of five years. As consideration for his covenant, it was agreed that Greenway would be paid $1,080,000, payable in quarterly payments of $18,750. No consideration was given for Coraci's covenant not to compete other than City Environmental's agreement to assume the on-site environmental cleanup at the Calahan facility because Coraci was, by this time, retired and out of the business.

Then, on November 15, 1990, Greenway individually entered into an Independent Contractor Consulting Agreement with City Environmental by which Greenway would be paid $500 per day for a period of two months to provide advice and consultation to City Environmental regarding U.S. Chemical's business operations.

10. Evidence presented in this case establishes that one of the primary motivating factors for City Environmental's purchase of U.S. Chemical was to be able to provide waste treatment services that U.S. Chemical was authorized to perform at the Calahan facility under the RCRA permit.

11. It appears from the record that U.S. Chemical actually became aware in mid–1985, i.e., well-before the receipt of the EPA November 1989 letter, that it was considered a PRP at the Metamora Landfill. [See U.S. Chemical's response to Metamora Settling Defendants' Interrogatory No. 53.]

expend additional monies in the further. The letter further explained that as a PRP, U.S. Chemical could be held liable for the entire amount of response costs, and advised U.S. Chemical to participate in a voluntary settlement with the other PRPs.

Despite the fact that negotiations with City Environmental were actively taking place at the time that U.S. Chemical received the November 1989 EPA letter,[12] U.S. Chemical did not immediately advise City Environmental of the EPA's letter or its contents. Even after City Environmental's express request in January of 1990 that U.S. Chemical provide City Environmental with all the information U.S. Chemical had relative to the company's involvement at any Superfund Sites, U.S. Chemical still did not inform City Environmental about the November 1989 EPA letter.[13]

In mid-January 1990, U.S. Chemical was invited to send a representative to attend a meeting to be held later that month with other recently-notified Metamora PRPs. The purpose of the meeting was to provide PRPs with information regarding the Metamora Landfill, as well as to address the organization of a PRP group and steering committee, and the possibility of an allocation of costs among the PRPs. Defendant Greenway attended the January 24, 1990 Metamora PRP meeting on behalf of U.S. Chemical.

Greenway admitted at his deposition that, based on the number of drums of waste attributable to U.S. Chemical at the Metamora Landfill, U.S. Chemical was likely to be "one of the bigger parties" involved in the allocation process.

Apparently, Greenway was hopeful that he could negotiate an "ability to pay" settlement of U.S. Chemical's allocated share of the Metamora Landfill costs.[14] In late January and early February 1990, Greenway met with representatives of fellow Metamora PRPs Ford Motor Company and General Motors Corporation to discuss settlement of U.S. Chemical's exposure at the Metamora Landfill based upon its financial ability to pay. Greenway came away from those meetings believing that such a settlement could be worked out. No such settlement, however, was worked out.[15]

### E. CITY ENVIRONMENTAL'S CONTACT WITH THE METAMORA SETTLING DEFENDANTS

Following the consummation of the U.S. Chemical Asset Purchase and Sale Agreement, in March of 1991, representatives of some of the Metamora PRPs contacted City Environmental representatives and indicated that, in light of City Environmental's purchase of U.S. Chemical, the Metamora PRPs would be looking to City Environmental to

12. In November 1989 through January 1990, U.S. Chemical and City Environmental were engaged in drafting and revising a proposed first draft of an asset purchase agreement.

13. Notwithstanding U.S. Chemical's failure to inform City Environmental about the November 1989 EPA letter, City Environmental was well-aware, for quite some time prior to the entering into the Asset Purchase and Sale Agreement on October 12, 1990 that U.S. Chemical's off-site CERCLA liabilities were substantial.

In December 1989, Mr. Greenway informed City Environmental that U.S. Chemical's liability for off-site environmental obligations was "very substantial". More specific information was sent to City Environmental regarding U.S. Chemical's involvement at various Superfund sites in mid-January 1990. Later that same month, City Environmental requested that U.S. Chemical retain a net worth of $500,000 reserved specifically for potential CERCLA liabilities. In April 1990, City Environmental's environmental investigator,

Techna, advised City Environmental that its regulatory investigation of U.S. Chemical "revealed that U.S. Chemical may have incurred significant responsible party liabilities at several CERCLA sites".

14. Prior to 1990, U.S. Chemical had a 10–year history of resolving its off-site Superfund CERCLA exposures by negotiating a reduced payment based upon U.S. Chemical's financial ability to pay. U.S. Chemical had, in fact, negotiated "ability to pay" settlements with respect to the Berlin & Farro, LDI, and Forest Waste Superfund Sites.

15. U.S. Chemical continued to seek an "ability to pay" settlement after consummation of the Asset Purchase Agreement. But, while the Metamora steering committee has offered other Metamora PRPs an "ability to pay" mechanism, no such offer was ever extended to U.S. Chemical, even though U.S. Chemical expressly requested such a settlement opportunity in writing.

pay U.S. Chemical's exposure at the Metamora Site.

On April 17, 1991, an Allocation Consultant retained by the Metamora PRP group submitted to it an Allocation Report, which allocated a percentage of waste and dollar value to PRPs at the Metamora Landfill Site.[16] The Allocation Report allocated U.S. Chemical a minimum share of the Metamora cleanup costs in the amount of $5.3 million, based upon 100% PRP participation.[17] The Metamora PRP steering committee approved the Allocation Report in September 1991. It is liability for this $5.3 million sum that the Metamora Settling Defendants in this action seek to impose upon City Environmental.

## F. CITY ENVIRONMENTAL'S AND U.S. CHEMICAL'S BUSINESS SINCE THE OCTOBER 1990 ASSET PURCHASE AND SALE AGREEMENT

### 1. *U.S. Chemical*

U.S. Chemical did not liquidate or dissolve following the October 12, 1990 closing of the Asset Purchase and Sale Agreement. The company presently has assets in the approximate amount of $1.1 million. This is approximately the same value of U.S. Chemical immediately prior to the October 12, 1990 closing.[18] However, it does not appear that since the October 12, 1990 sale of assets to City Environmental, U.S. Chemical has done, or is doing, any kind of business, but rather merely exists "on paper".

U.S. Chemical no longer has any employees, machinery, equipment or customers, and the only activities continued by the company since the closing are collecting accounts receivable and defending claims against it. Mr. Greenway testified in his deposition that U.S. Chemical has formulated what appears to be a liquidation plan, pursuant to which U.S. Chemical's assets will be distributed to creditors (apparently on a pro-rata basis) to discharge any and all existing liabilities.

### 2. *City Environmental*

From October 12, 1990 until June 30, 1992, City Environmental continuously operated the Calahan facility.

Although as indicated above, City Environmental did not purchase U.S. Chemical's name, both U.S. Chemical and City Environmental notified U.S. Chemical's former customers by letter in early November 1990 (i.e., shortly after the closing on the Asset Purchase and Sale Agreement) that City Environmental had acquired "substantially all of the assets" of U.S. Chemical, and that U.S. Chemical's business "will continue to operate at 29163 Calahan, Roseville, MI 48066 under the name of City Environmental, Inc.—Calahan Facility."[19]

City Environmental, in fact, continued after the October 12, 1990 closing to service all of U.S. Chemical's former customers, using U.S. Chemical's Calahan facility equipment and solvent reclamation process. Further, with one exception, City Environmental continued to employ all of U.S. Chemical's former employees.[20] City Environmental has

16. That report is subject to a confidentiality agreement, and is only available to members of the Metamora Landfill PRP group or those PRPs who participated in the allocation process.

17. On July 18, 1991, a proposed Consent Decree was filed with the U.S. District Court in Flint which provides that the Metamora Settling Defendants are jointly as severally liable (along with a number of other companies apparently responsible for the dumping of hazardous waste at the Metamora Landfill) for performing the cleanup and for paying the cleanup costs at the Metamora Landfill, but that they may, among themselves, agree to an apportionment of liability. According to the Court docket, the Consent Decree has not yet been entered by Judge Newblatt. Apparently, a public interest group, Citizens United, has been granted leave to intervene and is opposing entry of the Consent Decree.

18. U.S. Chemical's July 31, 1990 balance sheet listed assets in the amount of $1,148,874.44 and shareholder equity in the amount of $1,044,132.11.

19. In addition to the Calahan facility itself, under the Asset Purchase and Sale Agreement, City Environmental also acquired U.S. Chemical's RCRA permit, equipment, vehicles, goodwill, intellectual property rights, books, records, customer lists, sales data, inventory, customer contracts and purchase orders. [See Section 1 of the October 12, 1990 Asset Purchase and Sale Agreement, Ex. 6, pp. 1–6.]

20. All of U.S. Chemical's employees were terminated just prior to the closing of the Asset Purchase and Sale Agreement, and then, with one exception, rehired by City Environmental to start

also continued to use the same telephone number used by U.S. Chemical prior to the acquisition.

However, none of U.S. Chemical's officers, shareholders or directors have ever been officers, directors, or shareholders of City Environmental or its parent company, City Management. Nor have any of the officers, directors or shareholders of City Environmental and City Management ever been officers, directors or shareholders of U.S. Chemical.

On June 30, 1992, City Environmental stopped accepting waste from its customers and suspended operations at the Calahan facility so that it could develop a coherent plan to deal with the substantial and costly remediation cleanup needed on the Calahan Property, and to upgrade equipment to bring the facility into compliance with the law and to meet market need.

## G. CITY ENVIRONMENTAL'S ATTEMPT TO RESCIND THE OCTOBER 1990 ASSET PURCHASE AND SALE AGREEMENT

By letter dated April 10, 1991—shortly after being notified by representatives of some of the Metamora PRPs that the Metamora PRPs would be looking to City Environmental, as the purchaser of U.S. Chemical, to pay the $5.3 million share of cleanup costs allocated to U.S. Chemical—City Environmental notified U.S. Chemical of its intent to rescind the October 12, 1990 Asset Purchase and Sale Agreement. As stated in the April 10, 1991 letter:

> The legal basis for rescission includes, but is not limited to, a mutual mistake between the parties relating to City Environmental being pursued for successor liability. As you know, it was the express intent of the parties that City Environmental not assume the liabilities of U.S. Chemical. The transaction between the two companies was mutually structured as a limited asset purchase agreement, to achieve that intent.

> Each party understood and believed that any environmental liability such as Metamora, would remain with U.S. Chemical.

[4/10/91 letter, Ex. 33.]

On May 6, 1991, U.S. Chemical rejected City Environmental's rescission. Then, on June 7, 1991, City Environmental and U.S. Chemical entered into an Escrow Agreement under which all monies due under the Asset Purchase and Sale Agreement and Greenway's Agreement not to Compete are paid by City Environmental into escrow pending resolution of the successor liability issue.[21]

On September 18, 1991, City Environmental filed this action seeking a declaratory judgment on the successor liability issue that it is not liable for U.S. Chemical's off-site CERCLA environmental obligations, or if it is liable for these off-site obligations, that the extent of its liability be limited to the value of the assets received.

## IV. LEGAL ANALYSIS

## A. THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.

The standards governing a trial court's consideration of motions for summary judgment were redefined by the United States Supreme Court in three 1986 cases: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit expressly adopted this "new era" in summary judgment practice in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), and delineated in that case the principles extracted from the 1986 Supreme Court trilogy and their progeny that are to

work at the Calahan facility the following Monday. (The employees are not unionized.)

21. Prior to execution of the Escrow Agreement, City Environmental had already paid to U.S. Chemical $12,500 of the $720,000 purchase price and to Greenway, $18,500 of the amount owing under the Agreement Not to Compete. City Environmental has now also paid into the escrow account $75,000 toward the purchase price and $112,500 toward the amount owing Greenway on his covenant not to compete.

guide trial courts in this circuit in deciding motions for summary judgment:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.*, the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

886 F.2d at 1478–1480 [footnotes omitted].

The Court will decide the "successor liability" summary judgment motions before it by application of the foregoing principles.

B. THE SIXTH CIRCUIT HAS DETERMINED THAT SECTION 9607 OF CERCLA APPLIES TO SUCCESSOR CORPORATIONS.

CERCLA extends liability for hazardous waste cleanups to the "covered persons" (i.e., responsible parties) listed in 42 U.S.C. § 9607(a). That section of the Act provides, in pertinent part, as follows:

§ 9607. Liability

(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date

Notwithstanding any other provision or rule of law ...

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any other person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe ...;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title....

42 U.S.C. § 9607(a).

"Person" is defined in Section 9601(21) of CERCLA as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body."

Although Sections 9601(21) and 9607(a) are silent with respect to successor corporations, the Sixth Circuit recently determined that Congress intended to include successor corporations and associations among the entities enumerated in the definition of "person" in Section 9601(21). *Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d 1240 (6th Cir. 1991). In reaching that conclusion, the *Anspec* court applied the United States Code rules of construction applicable to all federal statutes set forth in 1 U.S.C. §§ 1–6—specifically 1 U.S.C. § 5—which states that when the word "company" or "association" is used in a statute in reference to a corporation, it "shall be deemed to embrace the words '*successors and assigns* of such company or association' in like manner as if the last-named words, or words of similar import were expressed."

The Sixth Circuit's determination that successor corporations are within the meaning of "persons" for the purpose of CERCLA liability is consistent with the determinations of the Third, Fourth, Eighth and Ninth Circuits. *See, Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3rd Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260 (9th Cir.1990); *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478 (8th Cir.1992); *United States v. Carolina Transformer Co.*, 978 F.2d 832 (4th Cir.1992).

C. THE LAW IN THIS CIRCUIT IS THAT IN CERCLA ACTIONS, STATE LAW IS TO BE APPLIED IN DETERMINING WHETHER SUCCESSOR LIABILITY EXISTS.

Relying on *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3rd Cir.1988), and *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1263 (9th Cir. 1990), the Navistar Defendants vigorously argue that federal law should be applied to determine whether successor liability under CERCLA exists. However, as Plaintiff and the Metamora Settling Defendants have noted, the Sixth Circuit has held otherwise—in this circuit, courts have been expressly directed to follow the applicable *state* law of successor liability when faced with that issue in CERCLA cases. *Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1248 (6th Cir.1991). The *Anspec* case—like the instant action—involved corporations which were organized under Michigan law.

As Judge Kennedy explained in her separate concurring opinion in *Anspec* written specifically "to express why [she] believe[s] state law should be applied", *id.*,

Although federal law ultimately controls the issue of CERCLA liability, "controversies governed by federal law, do not inevitably require resort to uniform federal rules. Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'" *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979).... I believe that the existence and status of a "corporation" allegedly liable under section 9607 should be determined by reference to the law under which

the "corporation" was created. All the corporations involved here are creatures of state law and such questions should be determined by reference to the law of the state of their incorporation, unless the application of that law would conflict with federal policy.

Convenience and common sense also point to the adoption of state corporation law as the federal law to be applied in this case, for the purpose of determining whether any of the defendants are liable as a "corporation" under CERCLA. All are artificial creations, wholly dependent on state law for their existence. Those laws define their powers rights and liabilities, prescribe their procedures, govern their continued existence, and define the terms upon which mergers may occur and the effect to be given to mergers.

\* \* \* \* \* \*

CERCLA does not purport to be a source of authority for corporate existence and corporate vicarious liability; rather the act was intended "to facilitate the prompt cleanup of hazardous waste sites by placing the ultimate financial responsibility for cleanup on those responsible for the hazardous wastes." Therefore, CERCLA does not require that federal law displace state laws governing corporate existence and vicarious liability unless the state laws permit action prohibited by the ACT, or unless "their application would be inconsistent with the federal policy underlying the cause of action."

922 F.2d at 1248–1250 (citations and footnotes omitted).[22]

As indicated above, both City Environmental and U.S. Chemical were incorporated under Michigan law. Accordingly, as directed by the Sixth Circuit, this Court will apply Michigan law to determine whether successor liability may exist in this case.

## D. THE MICHIGAN DOCTRINE OF SUCCESSOR LIABILITY IN ASSET PURCHASE TRANSACTIONS.

■ The universally-accepted general rule is that where one corporation purchases business assets from another corporation, and a fair consideration was paid, the purchaser does *not*, simply by virtue of the asset purchase transaction, become responsible for the seller's liabilities. *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873, 878, n. 3 (1976); *Pelc v. Bendix Machine Tool Corp.*, 111 Mich.App. 343, 351, 314 N.W.2d 614 (1981); 19 Am.Jur.2d § 1546, pp. 922–924). The courts, however, have carved out four exceptions to this general rule in asset purchase transactions. The accepted exceptions to no liability in asset purchase transactions are:

1. Where the purchaser expressly or impliedly agrees to assume the seller's liabilities; or

2. Where the transaction amounts to a consolidation or merger; or

3. Where the purchasing corporation was a mere continuation or reincarnation of the seller corporation; or

4. Where the transaction was entered into fraudulently, in order to escape liability.

*Turner, supra, quoting* 19 Am.Jur.2d § 1546; *Antiphon v. LEP Transport, Inc.*, 183 Mich. App. 377, 382, 454 N.W.2d 222, 224 (1990).

Defendants seek to hold City Environmental liable for U.S. Chemical's off-site CERCLA obligations by application of the third and fourth exceptions to "no asset purchase successor liability"—the "continuation" exception and the "fraudulent conveyance" exception.[23]

22. Judge Kennedy further rejected *Smith Land* and *Louisiana–Pacific*, (the cases relied upon by the Navistar Defendants in this case), noting, "Both of those courts [merely] concluded, almost without [any] analysis, that a federal common law of successor liability was required by CERCLA." 922 F.2d at 1249, n. 5.

23. Although the Metamora Settling Defendants assert at the top of page 5 of their September 15, 1992 Brief in Support of their Motion for Summary Judgment that "[t]his case involves the imposition of successor liability under the second, third and fourth circumstances—implied assumption, "mere continuance" and fraudulent conveyance," this sentence is the only mention of application of the "implied assumption" exception. Only the "mere continuance" and "fraudulent conveyance" theories are briefed in Defendants' Brief, and therefore, the Court will only

### 1. The Traditional "Mere Continuation" Exception and the Expanded "Continuity of Enterprise" Rule

 The traditional "mere continuation" doctrine "encompass[es] the situation where one corporation sells its assets to another corporation *with the same people owning both corporations*." *Turner, supra*, (Coleman, J. dissenting) 244 N.W.2d at 892 (emphasis added). *Kelley v. Thomas Solvent Co.*, 725 F.Supp. 1446, 1458 (W.D.Mich.1988) ("The oft-cited factors ... used to establish successor liability under the "mere continuation" doctrine are: *a common identity of officers, directors and stockholders* between the selling and purchasing corporations." *Id.*)

Notwithstanding the foregoing "traditional" approach, in *Turner v. Bituminous Casualty Co., supra*, 244 N.W.2d 873, a product liability action, the Michigan Supreme Court expanded the "mere continuation" exception. In that case, the Court adopted the rule that, in a sale of corporate assets for cash, there need not be a "continuity of shareholders" in order to find successor liability on the part of the purchasing corporation if the following three requirements are satisfied:

(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, asset, and general business operations.

(2) The seller corporation ceases its ordinary business operations, liquidates and dissolves as soon as legally and practically possible.

(3) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

244 N.W.2d at 879, 883. This expanded rule is commonly referred to as the "substantial continuation" or "continuity of the enterprise" rule.

Since the *Turner* decision, Michigan courts have further broadened the rule of that case by eliminating the second *Turner* element—liquidation and dissolution of the seller corporation. As the Michigan Court of Appeals stated in *Haney v. Bendix Corp.*, 88 Mich. App. 747, 279 N.W.2d 544 (1979),

We do not interpret *Turner* as standing for the proposition that plaintiff establish a de facto merger before successor liability attaches. Rather, *the stated requirements are only guidelines.*

*The availability of the transferor corporation is simply a factor in determining continuity.* It is not an independent prerequisite to the imposition of liability. Continuity and dissolution may be the prerequisites when a de facto merger is involved. When a sale of assets for cash is involved, continuity alone is the test.

279 N.W.2d at 546 (emphasis added).

In seeking to hold City Environmental liable for U.S. Chemical's off-site CERCLA obligations under the doctrine of successor liability, the Defendants vigorously argue for application of the expanded "continuity of enterprise" rule. City Environmental, on the other hand, argues with equal vigor that, since the Michigan Supreme Court in adopting the expanded rule in *Turner* was dealing with application of successor liability in a *products liability* case, it did not intend the rule to be applied in *any* case outside of the products liability context. Therefore, City Environmental argues that the "continuity of enterprise" rule should not be applied in CERCLA cases, and since there is no "continuity of shareholders" in this case, the traditional mere continuation rule does not apply here, either.

Although several Michigan cases since *Turner* have applied the "continuity of enterprise" rule,[24] to date, no Michigan state or

treat these two exceptions as being at issue in this case.

**24.** *See Haney v. Bendix Corp.*, 88 Mich.App. 747, 279 N.W.2d 544 (1979) (products liability case); *Powers v. Baker–Perkins, Inc.*, 92 Mich.App. 645, 285 N.W.2d 402 (1979) (products liability case); *Lemire v. Garrard Drugs*, 95 Mich.App. 520, 291 N.W.2d 103 (1980) (breach of warranty claim); *Liberty Mutual Ins. Co. v. Curtis Noll Corp.*, 112 Mich.App. 182, 315 N.W.2d 890 (1982) (contractual indemnification claim); *Langley v. Harris Corp.*, 413 Mich. 592, 321 N.W.2d 662 (1982) (negligence and workers' compensation claims); *Fenton Area Schools v. Sorensen–Gross Constr.*,

federal court has been called upon to decide the issue of whether that expanded exception—or some form of it—should apply in the CERCLA context.[25] However, several courts from other jurisdictions have recently addressed this issue, and therefore, this Court will look to the decisions of those other courts for guidance.

As an initial matter, the Court notes that, in those jurisdictions that have adopted the "continuity of enterprise" doctrine, including Michigan, the rule has generally been accepted in the product liability area. However, the rule actually had its genesis in the *Golden State Bottling Company, Inc. v. N.L.R.B.*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), *an unfair labor practices case.* In *Golden State*, the U.S. Supreme Court extended traditional successorship liability doctrines and held that

> [A] bona fide purchaser, acquiring, with knowledge that the wrong remains unremedied, the employing enterprise which was the locus of the unfair labor practice, may be considered in privity with its predecessor for purposes of [unfair labor practices liability].

At 180, 94 S.Ct. at 423. The Court went on, however, to qualify its holding, emphasizing that it was not endorsing a blanket "in-all-cases" ruling, but rather was limiting application of its decision to cases where the record demonstrated *"[a] tie between the offending employer and the bona fide purchaser of the [seller/employer's] business [and supported] a finding of a continuing business enterprise".* *Id.* (Emphasis added.)

In the CERCLA context, the Eighth Circuit's recent decision in *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478 (8th Cir.1992), emphasizes *Golden State's* holding regarding the need for a finding of both a "continuing of business" *and* some kind of "tie" between the selling and purchasing corporations in order for successor liability to arise out of an asset purchase transaction.

The *Mexico Feed* case involved CERCLA liability for toxic waste stored by Pierce Waste Oil Service, Inc. ("PWOS") in tanks on Mexico Feed and Seed Company property. PWOS was owned by Jack Pierce, who was also the company president. It was Pierce who negotiated the lease of the Mexico Feed property for the placement of the storage tanks with Mexico Feed's company president, James Covington.

PWOS actively used the storage tanks from the mid–1960's until 1976 to store waste oil containing PCBs hauled from its customers until enough oil was collected to be hauled to its Springfield, Illinois re-processing plant. Neither Mexico Feed nor James Covington ever used the tanks for their own purposes.

In the summer of 1983, Pierce sold the assets of PWOS to Moreco Energy, Inc., a pre-existing corporation in the oil re-refining business with operations in several states. Moreco's stated purpose for purchasing PWOS's assets was to strengthen its ability to collect waste oil for processing at its McCook, Illinois facility. 980 F.2d at 483. Primarily, Moreco was interested in the trucks routes, drivers and expertise that PWOS had accumulated. *Id.*

At the time of the sale, Jack Pierce owned 90% of PWOS. He retired from the presidency of PWOS a few months before the sale and never worked for Moreco. In February of 1984, Pierce dissolved PWOS and distributed the proceeds.

Following the asset purchase, Moreco ran PWOS's collection network in essentially the same manner as PWOS had run it, with many of the same employees, collection routes and trucks, except that it redirected the end point of the network to its McCook facility.

Moreco did not immediately remove PWOS's name from the PWOS oil collection trucks transferred to it as part of the asset purchase transaction, and the PWOS name

---

124 Mich.App. 631, 335 N.W.2d 221 (1983) (products liability claim).

**25.** In *Kelley v. Thomas Solvent Co., supra,* Judge Enslen did not have to deal with the expanded "continuity of enterprise" rule because he found

that the more stringent traditional "mere continuation" rule was satisfied. In that case, the court found that there *was* a 100% continuity of shareholders *and* a continuity of directors and officers, as well. 725 F.Supp. at 1458.

remained on receipts, insurance policies, and in state regulatory agency paperwork for a few years. *Id.* Moreco also hired Martin Pierce, former PWOS owner and president Jack Pierce's son, to run daily operations of a portion of the acquired PWOS network. He subsequently was elected to Moreco's board of directors several years after the sale. *Id.*

However, the toxic waste oil Mexico Feed tanks were never used by Moreco; Moreco did not know of their existence until the EPA brought them to the company's attention at some point in time during the year after the asset purchase transaction was consummated. *Id.*

After inspecting the Mexico Feed tanks, the EPA sued Mexico Feed and its president, James Covington, as owners of the land, PWOS and its owner Jack Pierce, as owners of the tanks, and Moreco, as the successor of PWOS.

After the district court held Moreco jointly liable with PWOS under a theory of successor liability, Moreco appealed. The Eighth Circuit reversed.

In a well-reasoned opinion, the appellate court in *Mexico Feed* first determined that "successor corporations" are covered persons under CERCLA. In resolving that initial issue, the Eighth Circuit relied principally upon the Sixth Circuit's *Anspec* ruling. The court then turned to the issue of whether the expanded "substantial continuity" doctrine should apply in CERCLA cases. In so doing, the court first discussed the U.S. Supreme court's seminal *Golden State* decision [discussed *supra* ], and discussed the generally accepted "test" for finding "substantial continuity" that has evolved since *Golden State:*

> The test considers an identity of stock, stockholders, and officers, but not determinatively. It also considers whether the purchaser retained the same facilities, the same employees, same name, same produc-

tion facilities in the same location, same supervisory personnel, and produced the same product; maintained a continuity in assets; continued the same general business operations; and held itself out the public as a continuation of the previous enterprise.

*Id.* at 488 n. 10 (citations omitted).[26]

The court then looked at the stated legislative purpose of CERCLA and other CERCLA cases involving application of broadened "substantial continuity" doctrine. The court explained:

> As we again point out, CERCLA is aimed at imposing cleanup costs on the parties responsible for the creation or maintenance of hazardous waste sites. Therefore, in the CERCLA context, the imposition of successor liability under the "substantial continuation" test is justified by a showing that in substance, if not in form, the successor is a responsible party. *The [CERCLA] cases imposing "substantial continuation" successorship have correctly focused on preventing those responsible for the wastes from evading liability through the structure of subsequent transactions.*[27]

For example, in *Distler,*[28] 741 F.Supp. at 637, three top employees incorporated to buy out their corporate employer. Although none of them had previously held their employer's stock, they, as general manager, general sales manager, and plant manager, essentially ran the business. They had no other business or employment either before or after the transaction. They were well aware of their former employer's practices. Although the corporation remained unchanged in everything but ownership, the traditional ["mere continuation"] test would not have considered it a corporate successor. Thus, had the court not found a "substantial continuation," those responsible for hazardous waste would have escaped liability, and the pur-

---

**26.** The *Mexico Feed* court's synopsis of the generally-accepted "substantial continuity" test is substantially the same test as formulated in *Turner* and its Michigan progeny.

**27.** The Sixth Circuit expressly noted the congressional intent discussed by the *Mexico Feed* court in *Anspec Co. v. Johnson Controls, Inc., supra:*

> Congress intended that those responsible for disposal of chemical poisons bear the cost and responsibility for remedying the harmful conditions they created.
>
> 922 F.2d at 1247.

**28.** *United States v. Distler,* 741 F.Supp. 637 (W.D.Ky.1990).

poses of CERCLA would have been thwarted.

In *United States v. Carolina Transformer Co.,* 739 F.Supp. 1030 (E.D.N.C.1989), *aff'd* 978 F.2d 832, 838 (4th Cir.1992),[29] CERCLA successor liability was likewise imposed under the "substantial continuation" theory. There, the children of the owner of the selling corporation owned the purchasing corporation. The father also controlled the purchasing corporation, and could write checks on the purchaser's corporate account. There was no colorable question of the purchaser's knowledge of and benefit from the seller's conduct for which CERCLA liability attached, or of the seller's and purchaser's practical identity. Under the traditional tests, since these two corporations were technically owned by different parties, the purchaser could have evaded CERCLA liability and again the purpose of the statute would have been thwarted.

\* \* \* \* \* \*

The other cases to which we are referred deal with either the abstract principle of successor liability under CERCLA, traditional corporate successors, or "substantial continuity" as a permissible legal theory or question of fact in the context of summary judgments. *See Anspec,* 922 F.2d at 1240, *Smith Land,* 851 F.2d at 86, *United States v. Western Processing Co.,* 751 F.Supp. 902 (W.D.Wash.1990). While they do not shed light on our fact specific problem, these cases correctly urge that corporate successor liability be imposed in such a way to further CERCLA's essential purpose of holding responsible parties liable. *See Anspec,* 922 F.2d at 1247.

980 F.2d at 488–89 (footnotes omitted and emphasis added).

This Court finds the Eighth Circuit's reasoning in *Mexico Feed* persuasive and believes that if the Michigan court were to consider the issue of whether the *Turner* "continuity of enterprise" rule should be applied in the CERCLA context, it would likewise find that case persuasive. Further, as the Eighth Circuit held in *Mexico Feed,* this

Court does not believe that the Michigan court would so liberally apply the expanded *Turner* "continuity of enterprise" doctrine, as Defendants seem to want, without any consideration of whether there are any substantial "ties" between the selling and purchasing corporations.

To be sure, in *Turner,* the Michigan court did away with a requirement of "100% identity of shareholders". However, this Court does not view the elimination of the identity of shareholders requirement as mandating an elimination of all consideration of all ties— i.e., identity of officers, directors, etc.—in all cases, and particularly in CERCLA cases. To not require that consideration would be to ignore the express congressional mandate that CERCLA be applied to prevent those *responsible* for hazardous waste from escaping liability. This Court does not find that it was Congress's intent that persons having nothing whatsoever to do with hazardous waste dumping should become liable for clean-up costs or responsibility, and the Court does not believe that the Michigan court would contravene such expressly stated congressional intent, either.

Thus, this Court finds that the "substantial continuity a/k/a continuity of enterprise" doctrine, as interpreted by the Eighth Circuit, would apply—under the appropriate factual circumstances—in CERCLA successor corporation liability actions in Michigan.

■ The issue remains whether this case presents such appropriate factual circumstances to warrant application of the doctrine. The Court finds that it does not.

This Court sees a marked distinction between this case and the *Carolina Transformer* and *Distler* cases upon which Defendants rely, and instead views this case as being factually very similar to the *Mexico Feed* case.

In both *Carolina Transformer* and *Distler,* although there was no "continuity of shareholders" in either case, both actions involved purchasers which had substantial "ties" to the seller corporations. In *Carolina Transformer,* the purchasing corporation continued the business of the seller corporation. More

---

**29.** Defendants here rely principally upon the *Carolina Transformer* case in this action.

importantly, however, the children of the owner of the seller corporation owned the purchasing corporation. Indeed, their father continued to effectively control the new business just as he did with the predecessor-seller. Similarly, in *Distler*, three of the seller's top-level employees formed the purchaser business for the express purpose of buying out their former employer.

As the Eighth Circuit observed in *Mexico Feed*, it was those "continuity" ties that led the courts in *Carolina Transformer* and *Distler* to find sufficient "continuity of the enterprise" to impose successor liability on the purchasing corporations so that the intent of Congress that those responsible for hazardous waste would not escape liability. As the *Mexico Feed* court noted, for the courts to have found otherwise in *Carolina Transformer* and *Distler*, "the purposes of CERCLA [that those responsible for hazardous waste be held liable for the costs of clean-up] would have been thwarted." 980 F.2d at 488.

The facts of this case are far more akin to the facts of *Mexico Feed* in which the court found insufficient indicia of continuity of enterprise to warrant imposition of successor liability under the expanded "substantial continuation" doctrine.

Just as in *Mexico Feed*, Moreco, the purchasing corporation, never used PWOS's storage tanks, in the instant action, it is undisputed that City Environmental never dumped waste at the Metamora Landfill. Similarly, just as the *Mexico Feed* court found that Moreco did not merely consist of the assets of it purchased from PWOS, City Management does not consist merely of U.S. Chemical's former assets. It is a larger, preexisting corporation, already well-established in the waste processing business.[30]

Admittedly, as Moreco did with respect to PWOS's business, City Environmental continued, after the asset purchase transaction at issue, to operate U.S. Chemical's Calahan reclamation business at the same facility, dealt with U.S. Chemical's former customers, used U.S. Chemical's stationery for a while

after the asset purchase transaction was consummated, and retained many, if not most, of U.S. Chemical's former Calahan facility employees, including, for a transition period one of the former directors of U.S. Chemical. However, as the Eighth Circuit found in *Mexico Feed*, these factors, without evidence that the purchasing corporation—here City Environmental—was somehow "responsible" for U.S. Chemical's toxic waste dumping at the Metamora Landfill or the other identified Superfund sites, the Court does not believe that it can act, consistent with the Congressional intent of CERCLA, and find "substantial continuity" for the purpose of holding City Environmental responsible and liable for the cost of clean-up of those sites.

■ At oral argument, the Metamora Defendants argued that City Environmental has indirectly accepted "responsibility" for U.S. Chemical's share of the clean-up of the Metamora site. Although Defendants admit that there is no "nexus" between City Environmental and the Metamora Landfill, they argue that it would be "bad policy" to let City Environmental "cherry pick" assets and leave behind liabilities. It was Defendants' position that it is "unfair" to permit a purchaser to realize the benefits of the enhanced value of the purchased entity contributed by the use, handling, and/or disposal of toxic substances while not having to incur the ongoing liabilities of the clean-up costs associated with these materials.

However, as the Court stated on the record at the January 21, 1993 hearing, to accept Defendants' all-encompassing "policy" argument would dramatically undercut the important public policy of alienability of property. A prospective purchaser would, under Defendants' theory, always and forever remain liable for the toxic substance liability of *any* company, of any size, that has ever in its past, disposed of, treated or used toxic substances in any phase of its operations. Needless to say, it would be virtually impossible to predict or project with any degree of accuracy such a company's contingent

---

30. At oral argument, Plaintiff's counsel represented that the U.S. Chemical assets purchased through the U.S. Chemical/City Environmental transaction actually constitute only 5% of City Management's assets.

CERCLA liabilities, and this uncertainty would, almost certainly, make the sale of the company highly unlikely.[31]

█ Defendants also attempted at oral argument to persuade the Court that the purchase price ultimately paid by City Environmental for U.S. Chemical's assets might have been reduced because of U.S. Chemical's off-site CERCLA liabilities. As the Court indicated at the January 21, 1993 hearing, it was concerned that if there is evidence that an adjustment of the purchase price was made for off-site CERCLA liabilities, such evidence might indicate an acceptance of responsibility, sufficient to establish a "tie" for substantial continuation/successor liability purposes.

Since the January 21 hearing, the Court has independently reviewed the six volumes of deposition exhibits submitted for the Court's review in connection with the instant motions and, based upon that review, the Court is convinced that the reduced purchase price resulting after the year and a half of negotiations was ultimately arrived at because of City Environmental's acceptance of responsibility *for the cost of clean-up of the Calahan Property.*

The evidence of record shows that on November 27, 1989, City Environmental sent U.S. Chemical a letter offering to purchase U.S. Chemical's assets for $3 million, subject to an environmental inspection of the premises. [See Ex. 8. See also, 12/11/89 "letter of intent" at Ex. 83B.] These initial offers said nothing about assumption of any liabilities. The first mention of environmental clean-up was on December 27, 1989 in a letter from City Environmental to U.S. Chemical indicating that "a significant new issue" had been introduced—a possible "offset" for the costs of remediation at the Calahan site. [Ex. 54.]

Thus, the first "formal" asset purchase and sale agreement entered into by the parties— that of January 12, 1990, provided for a reduced purchase price of $2.5 million, with an additional provision—Section 4.D "Environmental Price Adjustment"—which provided for further downward adjustments if the clean-up of the Calahan site ultimately exceeded certain set amounts, and a right to rescind if the necessary clean-up costs were determined to exceed $500,000. [See Ex. 2.] On April 13, 1990, City Environmental exercised that right to rescind, explaining in a letter to U.S. Chemical of that date, that its rescission was pursuant to Section 4.D and based on the environmental assessment report prepared by City Environmental's environmental investigator, Techna Corporation regarding the Calahan property. [See Ex. 106.]

City Environmental's April 13, 1990 rescission was followed by further negotiations regarding making the purchase price consist exclusively or partly of City Environmental's assumption of on-site environmental liabilities. [See May 24, 1990 letter at Ex. 13, and the August 20, 1990 preliminary draft asset purchase and sale agreement at Ex. 14.] The August 20, 1990 proposal called for a further reduced purchase price consisting of City Environmental's assumption of liability for clean-up of the Calahan Property plus a cash payment to U.S. Chemical of $2.1 million less one-half of the total cost of clean-up. [See Ex. 14.]

Ultimately, the purchase price agreed upon in the consummated October 12, 1990 *Asset Purchase and Sale Agreement* was a flat sum of $720,000 plus assumption of all liabilities for the entire cost of on-site clean-up of the Calahan Property. [See Ex. 16.]

As the foregoing documented chronology of events makes clear, the reduction of the amount of cash paid by City Environmental to $720,000 was in exchange for City Environmental agreement to assume liability for *on-site* clean-up of the Calahan Property, *only.* The Court finds no record evidence to support Defendants' contention that the

---

31. The Court would note that acceptance of this "policy" argument would certainly impact directly on many of the individual Metamora Settling Defendants, for they, themselves, are major manufacturers that use toxic substances in the manufacture of their products. By application of the argument that all purchasers, no matter how innocent or removed they may be from the manufacturers' disposal of toxic waste, nonetheless, are simply by virtue of acquiring and continuing the business rendered responsible for their predecessors' actions as a matter of law, would essentially make it impossible for any business to sell its assets.

downward purchase price adjustment was made because of U.S. Chemical's outstanding off-site CERCLA liabilities.

Defendants' contention is pure speculation. As the Supreme Court and the Sixth Circuit have made clear, it takes even more than a "scintilla of evidence" to withstand summary judgment. *See, Street v. J.C. Bradford & Co., supra,* 886 F.2d at 1478–1480.

For all of the foregoing reasons, the Court does not find any sufficient "ties" between City Environmental and the dumping of hazardous waste at the Metamora or other off-site landfills to find, consistent with the Congressional intent of CERCLA, "substantial continuity" of enterprise for the purpose of holding City Environmental responsible and liable for the cost of clean-up of U.S. Chemical's off-site toxic waste disposal.[32]

### 2. *The Asset Purchase Agreement Was Not Fraudulent.*

As indicated above, Defendants also argue for an application of the "fraudulent conveyance" exception to the general "no-successor-liability-in asset-purchase-transactions" rule.

Michigan law on fraudulent conveyances is governed by the Uniform Fraudulent Conveyance Act, M.C.L. §§ 566.11 *et seq.* The Act voids conveyances involving either "actual fraud" (§ 566.17) or "constructive fraud" (§ 566.14–16).

For purposes of summary judgment, the burden is on the party alleging fraud— here the Defendants—to establish *by clear and convincing evidence* all of the requisite elements of his particular fraud claim. *Aerospace America v. Abatement Technologies,* 738 F.Supp. 1061, 1068 (E.D.Mich.1990).

Defendants here argue for an application of Sections 566.15 and/or 566.16 of the Fraudulent Conveyances Act. These sections state as follows:

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

M.C.L. §§ 566.15–566.16.

The initial inquiry with respect to both of the foregoing Fraudulent Conveyance Act provisions is whether "fair consideration" was paid.

The Act provides that "fair consideration" is given for property "when in exchange for such property ... as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied...." M.C.L. § 566.13(a). Fair consideration under the Act does *not* mean the "exact equivalent" price. Rather, the Sixth Circuit has directed courts to look at all of the surrounding circumstances to determine whether the consideration is "not disproportionately small as compared to the payments received." *John Ownbey Co. v. Commissioner of IRS,* 645 F.2d 540, 545 (6th Cir.1981).

Defendants here appear to misunderstand that it is *not* incumbent upon City Environmental to prove that consideration *was* fair, i.e., "absence of fraud"; it is *Defendants'* burden to establish with record evidence that the consideration given was *not* "fair". They have not met this burden.

---

**32.** Not only does the Court find insufficient evidence to support the "continuation" prong of the *Turner* three-part "continuity of enterprise" test [see discussion *supra* at p. 635 of this Opinion and Order], but equally important, there is simply no evidence of record to satisfy the third prong of the *Turner* test—that the purchasing corporation "assume those liabilities and obli-

gations of the seller necessary for the uninterrupted normal business operations of the seller". 244 N.W.2d at 879, 883. The *only* U.S. Chemical liabilities assumed by City Environmental in this case were for the costs of environmental clean-up of the Calahan Property. No normal day-to-day business operations liabilities were assumed.

Moreover, based upon the evidence of record that has been submitted—and it is voluminous—the Court determines that "fair consideration" *was* paid. Not only did City Environmental pay $720,000 cash for the assets purchased, it also agreed to assume liability for all clean-up of the Calahan Property. The record establishes that well before the asset purchase transaction was consummated, both City Environmental and U.S. Chemical were sufficiently aware that the clean-up costs were going to be substantial. That no "exact" figure was established is immaterial. The parties had a good idea of the "range" of the clean-up costs would be from $1—$ 5 million. Given the totality of the circumstances in this case, the Court finds that "fair consideration" was paid. Therefore, the asset purchase transaction cannot be deemed to have amounted to a "fraudulent conveyance."

In sum, the Court determines that City Environmental does not come within any of the exceptions to the general rule that in asset purchase transactions the purchaser is not liable for the seller's liabilities.

## E. THE COURT FINDS NO MERIT IN DEFENDANTS' "LACK OF JURISDICTION" ARGUMENTS.

█ In their Brief in Response to Plaintiff's Motion for Summary Judgment, the Metamora Settling Defendants raised for the first time an argument that this Court does not have jurisdiction over Plaintiff's declaratory judgment Complaint, while arguing that the Court *does* have jurisdiction over the Defendants' counterclaim which seeks, in essence, the same kind of relief sought by Plaintiff—declaratory judgment. Plaintiff filed, with the Court's permission, a supplemental Brief responding to Defendants' lack of jurisdiction contentions, which brief Defendants subsequently moved to strike, requesting in the alternative that they be allowed to file a brief of their own on the jurisdiction issue.[33]

The Court finds no merit in Defendants lack of jurisdiction arguments. Essentially,

Defendants want this Court to construe Plaintiff's declaratory judgment complaint for a ruling on the successor liability issue as one seeking review of a "removal or remedial action". The terms of CERCLA limit *only* review of EPA administrative decisions regarding removal or remedial actions. 42 U.S.C. § 9613(h). Plaintiff here is clearly *not* seeking review of a removal or remedial action.

## CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment be and hereby is GRANTED and all of the Defendants' separately-filed Motions—the motions of the Metamora Settling Defendants, the Navistar Defendants and the Peripheral Defendants—are DENIED. Accordingly,

IT IS FURTHER ORDERED that summary judgment shall be entered in favor of Plaintiff on Count I of Plaintiff's Complaint, and Defendants' Counterclaim shall be DISMISSED with prejudice.

IT IS FURTHER ORDERED Counts II and III of Plaintiff's Complaint—having been pled in the alternative to Count I—are dismissed as MOOT.

IT IS FURTHER ORDERED that the Court having no independent subject matter jurisdiction over Count IV of Plaintiff's Complaint, that Court IV shall be DISMISSED pursuant to 28 U.S.C. § 1367(c)(3).

Each party shall bear their own costs and fees.

Let Judgment be entered accordingly.

## JUDGMENT

The Court having this date entered an Opinion and Order Regarding Four Motions for Summary Judgment in which granted the Plaintiff's Motion for Summary Judgment and denied the Defendants' Motions;

---

**33.** The Court will not strike Plaintiffs' supplemental brief and hereby grants, *nunc pro tunc,* Defendants' alternative request for leave to file a brief of their own on the jurisdiction issue. The Defendants have already submitted such a brief, which the Court has reviewed and considered.

NOW, THEREFORE, for the reasons stated by the Court in its Opinion and Order of this date,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that summary judgment be, and hereby is, entered in favor of Plaintiff on Count I of Plaintiff's Complaint

IT IS FURTHER ORDERED that Defendants' Counterclaim be, and hereby is, DISMISSED with prejudice.

IT IS FURTHER ORDERED Counts II and III of Plaintiff's Complaint—having been pled in the alternative to Count I—be, and hereby are, dismissed as MOOT.

IT IS FURTHER ORDERED that the Court having no independent subject matter jurisdiction over Count IV of Plaintiff's Complaint, that Court IV be, and hereby is, DISMISSED pursuant to 28 U.S.C. § 1367(c)(3).

Each party shall bear their own costs and fees.